### A08A1494. SEIBERT v. THE STATE.

(670 SE2d 109)

MIKELL, Judge.

A Gwinnett County grand jury returned two indictments against Steven Seibert. The first, Indictment No. 05B-3446-2, charged Seibert with one count of aggravated stalking (OCGA § 16-5-91) in connection with the allegation that on March 31, 2005, Seibert violated a permanent restraining order ("PRO") prohibiting him from contact with his ex-wife, Leslie Swords. The second indictment, No. 05B-03447-2, charged Seibert with two counts of aggravated stalking, based on violations of the PRO on April 30, 2005 and May 2, 2005, and with abandonment of a dependent child (OCGA § 19-10-1). The cases were consolidated for trial. After a jury trial, Seibert was convicted of two counts of aggravated stalking, the count alleged in the first indictment and Count 2 of the second indictment, and of misdemeanor abandonment of a dependent child. Seibert was sentenced to a total of 21 years, to serve the first 15 in confinement and the balance on probation.

On appeal, Seibert charges the trial court with three errors: (1) the denial of Seibert's demurrer, which was based upon the lack of authority of the magistrate judges who issued the restraining orders; (2) the violation of Seibert's right to free exercise of religion; and (3) the admission of harmful character evidence against Seibert and the denial of his motion for mistrial based thereon. Finding no error, we affirm.

> On appeal from a criminal conviction, we view the evidence in the light most favorable to support the jury's verdict, and the defendant no longer enjoys a presumption of innocence; moreover, this Court determines evidence

transcript, however, and reads almost verbatim to the way it is recalled by Bee in his pro se filing.

sufficiency and does not weigh the evidence or determine witness credibility.[1]

So viewed, the record shows that Leslie Swords and appellant Seibert were married for fourteen and one-half years and have two children, ages eighteen and fourteen. During their marriage, Swords and Seibert separated three times, in 1986, 1994, and 1996. Swords testified that the second separation followed an act of domestic violence, for which she contacted police, and that the final separation occurred after Seibert prevented Swords from receiving telephone calls by installing call block and prevented Swords from leaving the house by disconnecting the battery cables on Swords's vehicle. Swords reported these actions to police. Swords filed for divorce in January 1996, and the divorce was finalized in November 1998. As a part of the divorce decree, Swords was awarded sole custody of the children, and Seibert was ordered to pay $583 in child support twice a month. According to Swords, she has not received a child support payment since February 2002, and Seibert has not otherwise provided any financial support to her or the children since that time.

For several months at the beginning of 1999, Seibert called Swords ten to twelve times a day, which Swords reported to the phone company and to law enforcement. In addition to the visits to Swords's home to pick up the children, Swords testified that Seibert followed her, approached her at the post office, and started making numerous unannounced visits to her home. Swords described Seibert's behavior as threatening. She explained that he would show up unannounced and bang on the door or approach her while she was outside with the kids. Swords began to become fearful, particularly after one incident in July 1999 when Seibert walked into her home unannounced. She told him to leave and he exited the house, but he had to be told to leave the property by the police. On that occasion, Seibert had several firearms and a box of ammunition that could be seen through the window of his van. On August 11, 1999, Swords obtained a temporary restraining order, which expired in six months. Within two weeks, Swords returned to the court and obtained the PRO, which prohibited any contact whatsoever between Swords and Seibert, "directly, indirectly, by person, telephone, messenger or any other means of communication [and] include[d], but [was] not limited to, the victim's home, school, place of business or routes of travel to or from those locations." At the hearing, which was attended by Seibert, he and Swords were instructed to communicate only through their attorneys.

---

[1] (Footnote omitted.) *Holmes v. State*, 291 Ga. App. 196, 197 (1) (661 SE2d 603) (2008).

After obtaining the PRO, Swords and the children moved from Lawrenceville to Conyers in October 1999. They lived in Conyers for five years, during which time Seibert's visitation rights were terminated. After Seibert located them in Conyers, he left cards on their mailbox and at the homes of Swords's parents and sister, left items on Swords's front porch, faxed messages to Swords, and left phone messages addressed to her and the children. Swords reported Seibert's conduct to law enforcement.

Swords then relocated to Buford in Gwinnett County in April 2004, again providing Seibert with no contact information. Seibert contacted her at her residence in Buford approximately two months after the move by sending cards and letters to the children. One morning in March 2005, Seibert left a baseball as a birthday gift for their son. After retrieving the gift, Swords took the children to school and then notified law enforcement of the incident. Swords testified that she became fearful because she surmised that the gift had been left at her house by Seibert during the night. The next incident that caused her alarm was finding a note on her car that contained biblical references that were similar to those included in other correspondence from Seibert. After reading the scriptures included in the correspondence, Swords contacted law enforcement. A few days later, a dozen roses were delivered to Swords's home on the date that would have represented her and Seibert's twenty-first wedding anniversary. The roses included a card that wished Swords happy anniversary. Again, Swords contacted law enforcement. During April, the next month, Swords received a three-page-long, typewritten letter addressed to her from Seibert, which was introduced into evidence. Swords testified that the tone of the letter was disturbing because Seibert made false allegations against her, and the letter showed that Seibert did not accept their divorce. Swords gave the original letter to the police. Swords also testified that on Christmas Eve 2005, Seibert called her parents' home every 30 minutes until they disconnected the phone. The one time that Swords answered the phone, Seibert wished her "Merry Christmas" and hung up. Swords testified that since then, Seibert regularly sends letters that are addressed to her children to her home.

Seibert testified that he sent Swords the flowers because he missed her and still cared about her; that he sent letters to open communication with Swords; that he bought the baseball for his son but had someone else deliver it; that he did not leave notes on Swords's car; that he accidentally ran into Swords at the post office; and that he did not intentionally repeatedly call Swords's parents' home on Christmas Eve but was using a phone that kept disconnecting.

1. In his first enumerated error, Seibert argues that the trial

court erroneously denied his demurrer because the judges issuing the restraining orders were not empowered to do so. There is no dispute that the restraining orders were issued by associate magistrate judges, who were sitting by designation in superior court. The PRO was issued by associate magistrate Pamela D. South on August 25, 1999. Relying on OCGA § 15-1-9.1 (b) (2), Seibert argues that the only judges who could be designated to sit in superior court are the chief judge of any other court in the county, a senior judge of the superior court, a retired judge, or a judge emeritus of any court within the county. However, the statute provides, in pertinent part, that

> [i]f assistance is needed from a judge from the same county, the chief judge of any court within such county of this state may make a written request for assistance to the chief judge of any other court within such county, a senior judge of the superior court, a retired judge, or a judge emeritus of any court within the county. The request by the chief judge may be made if one of the following circumstances arises: . . . (E) A majority of the judges of the requesting court determines that the business of the court requires the permanent assistance of an additional judge or additional judges. If the requesting court is a state or superior court, the assisting judge or assisting judges may hear and decide matters otherwise in the exclusive jurisdiction of the state or superior court without regard to time, type of case, or limitations contained in the rules of such state or superior court; provided, however, that a chief magistrate or magistrate may serve as a permanent assisting judge only in counties having a population of 180,000 or more according to the United States decennial census of 1990 or any future such census.[2]

Seibert misreads the statute. The statute does not provide that *only* the chief judge of the magistrate court can serve by designation.

In *Adams v. Payne*,[3] cited by Seibert, the order authorizing the judge to preside was issued nunc pro tunc and no request for assistance had been made before the judge entered the judgment at issue, and the Supreme Court, therefore, found that the judgment was void.[4] Here, the appropriate request had been made before the judgment against Seibert was entered. The record shows that on

---

[2] OCGA § 15-1-9.1 (b) (2) (E).
[3] 219 Ga. 638 (135 SE2d 423) (1964).
[4] Id. at 640-641.

January 4, 1999, the chief judge of the Superior Court of Gwinnett County made such a request to

> the Chief Judge of the Magistrate Court of Gwinnett County and any magistrates he designates who have the qualifications to sit as a superior court judge by designation to assist this court during the period January 1 - December 31, 1999, by . . . (2) receiving petitions from persons seeking relief from family violence under the provisions of The Stalking Statute, OCGA § 16-5-94 and by conducting all hearings connected with the filing of the petition.

Our Supreme Court has held that "the designation of a magistrate to assist the requesting court cloaked the magistrate with statutory and constitutional authority to exercise the judicial power of the superior court."[5] Accordingly, we find no error.

2. In his next enumerated error, Seibert argues that the trial court violated his right to free exercise of religion by admitting a prayer that Seibert composed as impeachment evidence against him. However, Seibert has waived consideration of this claim on appeal.

The letter at issue was admitted during the cross-examination of Seibert. The salutation of the letter stated "Dear Lord," but the letter was mailed by Seibert to his daughter. Seibert explained that he mailed the letter to his daughter because he wanted his children to know that he was praying. Over a relevancy objection, the trial court admitted the letter. After some confusion about exhibit numbering, Seibert also later objected to the letter on the grounds that it was highly prejudicial. However, Seibert never objected on the ground that the introduction of the letter into evidence violated his right to the free exercise of religion, nor did he raise this argument on motion for new trial. "It is well settled that grounds which may be considered on appeal are limited to those which were raised at trial, and an objection on a specific ground at trial waives any objection to that evidence on other grounds on appeal."[6] Accordingly, this enumerated error fails.

3. Lastly, Seibert argues that the trial court erred when it admitted harmful character evidence against him and denied his motion for mistrial based on the admission of that evidence. The evidence at issue arose during Swords's direct examination when she was asked, "Has he ever pulled a gun on you?" She replied, "I've

---

[5] (Punctuation omitted.) *Giles v. State*, 257 Ga. App. 65, 67 (1) (570 SE2d 375) (2002), citing *Massey v. State*, 265 Ga. 632, 634 (2) (458 SE2d 818) (1995), overruled on other grounds, *Lewis v. McDougal*, 276 Ga. 861, 862 (1) (583 SE2d 859) (2003).

[6] (Citation, punctuation and footnote omitted.) *Johnson v. State*, 274 Ga. App. 641, 643 (3) (618 SE2d 716) (2005).

seen him pull a gun on someone else." Seibert objected on the grounds that her answer was nonresponsive, and the trial court sustained the objection. Seibert then moved for a mistrial, which, after argument, the trial court denied. The trial court then gave a detailed curative instruction advising the jury that Swords's response was not responsive and asking the jury to strike it from their recollection and not consider it in their deliberations. Seibert agreed to the court's curative instruction. After the instruction, Seibert renewed his motion for mistrial, which the trial court again denied.

"We review the denial of a motion for a mistrial for abuse of discretion, and will reverse only if a mistrial is essential to the preservation of the defendant's right to a fair trial."[7] We

> look[ ] at the relevant circumstances to determine if the trial court abused its discretion. . . . Some of the factors and circumstances to be reviewed include the nature of the statement, the other evidence in the case, and the action taken by the court and counsel concerning the impropriety.[8]

Even if we were to conclude that Swords's testimony improperly injected evidence of Seibert's bad character, we nonetheless find no error here, particularly in light of Seibert's testimony wherein he admitted to each act listed in the indictment, i.e., sending Swords roses on the date of their anniversary; and sending her letters, albeit inadvertently, according to his testimony.[9] We also note that the state correctly points out on appeal that the case on which Seibert relies in support of this enumeration of error is one in which the trial court denied the motion for mistrial *and* failed to give a curative instruction.[10] "Because a mistrial was not essential to preserve [Seibert]'s right to a fair trial, we will not disturb the trial court's determination."[11]

*Judgment affirmed. Smith, P. J., and Adams, J., concur.*

DECIDED OCTOBER 22, 2008 — 

*Mark A. Yurachek*, for appellant.

---

[7] (Punctuation and footnote omitted.) *Banegas v. State*, 283 Ga. App. 346, 349 (4) (641 SE2d 593) (2007).

[8] (Footnote omitted.) *Stokes v. State*, 272 Ga. App. 721, 722-723 (613 SE2d 225) (2005).

[9] See *Miller v. State*, 236 Ga. App. 161, 163 (2) (511 SE2d 552) (1999) (denial of motion for mistrial affirmed in light of evidence introduced at trial, the nature of the character evidence complained of, and the remedial measures taken by the trial court).

[10] See *Moon v. State*, 202 Ga. App. 500, 501-502 (2) (414 SE2d 721) (1992) ("[t]he trial court thus erred in denying defendant's motion or in failing, at least, to instruct the jury to disregard the testimony").

[11] (Footnote omitted.) *LaCount v. State*, 265 Ga. App. 352, 356 (3) (593 SE2d 885) (2004).

*Daniel J. Porter, District Attorney, Lisa A. Jones, Assistant District Attorney*, for appellee.